# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### ASHEVILLE DIVISION
### CIVIL CASE NO. 1:21-cv-00068-MR

JONATHAN ANTHONY LEE TORRES, )
                                    )
            **Plaintiff,**         )
                                      )      **MEMORANDUM OF**
**vs.**                                      )      **DECISION AND ORDER**
                                      )
**TODD ISHEE, et al.,**           )
                                      )
           **Defendants.**       )
_____ )

**THIS MATTER** is before the Court on Defendants Todd Ishee, Benjamin Carver, Robert Bret Bullis, David Cothron, Gregory Scott Swink, Briana Suttles, Mark A. Ervin, Cindy Haynes, Charles Bumgarner, Benjamin Coffey,[1] Nathan Ingram, Jeffrey Brendle, and Saint Tapp's Motion for Summary Judgment [Doc. 81].

## I.      BACKGROUND

The Plaintiff Jonathan Anthony Lee Torres, proceeding pro se, filed this action addressing incidents that allegedly occurred in the Rehabilitative and Diversion Unit at the Marion Correctional Institution.[2]   The Plaintiff's

_____

[1] The Clerk will be instructed to correct Defendant Coffey's name in the record.

[2] The Plaintiff is no longer incarcerated.

Second Amended Complaint passed initial review on claims under 42 U.S.C. § 1983 and the Religious Land Use and Institutionalized Persons Act ("RLUIPA") for imposing unconstitutional conditions of his confinement; using excessive force; violating his right to freely exercise his religion; and interfering with the mail.[3]  [Doc. 25: Second Am. Compl; Doc. 27: Order on Initial Review]. The Plaintiff seeks a declaratory judgment; injunctive relief; compensatory, nominal and punitive damages; reasonable attorney's fees and costs; further relief that the Court deems just and appropriate; and a jury trial.[4]  [Doc. 27 at 1, 5].

The Defendants filed the instant Motion for Summary Judgment.  [Doc. 81: MSJ; Doc. 83: MSJ Memo.].  Thereafter, the Court entered an Order in accordance with Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975), advising the Plaintiff of the requirements for filing a response to the summary judgment motion and of the manner in which evidence could be submitted to the Court.  [Doc. 85: Roseboro Order]. The Plaintiff filed Responses and

---

[3] The Complaint, Amended Complaint, and Second Amended Complaint are all unverified.

[4] The claims for declaratory and injunctive relief appear to be moot because the Plaintiff is no longer incarcerated. See Incumaa v. Ozmint, 507 F.3d 281, 286-87 (4th Cir. 2007). Also, the Plaintiff's request for attorney's fees appears to be moot as the Plaintiff is proceeding pro se.

exhibits.[5] [See Docs. 95, 116, 120: MSJ Responses; Docs. 96, 116: Resp. Exhibits].  The Defendants filed Notices that they do not intend to reply. [Docs. 97, 118: Notices].  This matter is ripe for disposition.

## II.   STANDARD OF REVIEW

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A fact is material only if it might affect the outcome of the suit under governing law.  Id.

The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal citations omitted).

---

[5] The relevant portions of the Plaintiff's verified filings will be considered in the summary judgment analysis.  [See, e.g., Doc. 10: TRO].

3

Once this initial burden is met, the burden shifts to the nonmoving party.  The nonmoving party "must set forth specific facts showing that there is a genuine issue for trial."  Id. at 322 n.3.  The nonmoving party may not rely upon mere allegations or denials of allegations in his pleadings to defeat a motion for summary judgment.  Id. at 324.  Rather, the nonmoving party must oppose a proper summary judgment motion with citation to "depositions, documents, electronically stored information, affidavits or declarations, stipulations …, admissions, interrogatory answers, or other materials" in the record.  See id.; Fed. R. Civ. P. 56(c)(1)(a).  Namely, the nonmoving party must present sufficient evidence from which "a reasonable jury could return a verdict for the nonmoving party."  Anderson, 477 U.S. at 248.  To that end, only evidence admissible at trial may be considered by the Court on summary judgment.  Kennedy v. Joy Technologies, Inc., 269 F. App'x 302, 308 (4th Cir. 2008) (citation omitted).

When ruling on a summary judgment motion, a court must view the evidence and any inferences from the evidence in the light most favorable to the nonmoving party.  Anderson, 477 U.S. at 255.  Facts, however, "must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts."  Scott v. Harris, 550 U.S. 372, 380, 127 S.Ct. 1769, 1776 (2007).  As the Supreme Court has emphasized,

"[w]hen the moving party has carried its burden under Rule 56(c), the opponent must do more than simply show there is some metaphysical doubt as to the material facts …. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" <u>Matsushita Elec. Industrial Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586-87, 106 S. Ct. 1348 (1986) (footnote omitted). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-28, 106 S. Ct. 2505 (1986). When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.

<u>Scott</u>, 550 U.S. at 380.

## III. FACTUAL BACKGROUND

The forecast of evidence, viewed in the light most favorable to the Plaintiff, shows the following.

### A. RDU

The Rehabilitative and Diversion Unit ("RDU") is designed as a safe alternative to Restrictive Housing for Control Purposes (RHCP) for offenders who exhibit aggressive or assaultive criminogenic behaviors. [Doc. 83-4: Swink Decl. at ¶¶ 11-12; <u>see</u> Doc. 83-19: MSJ Ex. at 21]. The RDU is a three-phase program that provides positive reinforcement and appropriate

consequences to increase desired behavior and to decrease unwanted behavior. [Id.]. Offenders in the RDU can be placed in non-participating status for, e.g., refusing to participate or receiving disciplinary actions. [Doc. 83-4: Swink Decl. at ¶ 25; Doc. 83-7: Bumgarner Decl. at ¶ 8; Doc. 83-19: MSJ Ex.]. Because the RDU is not voluntary, offenders have to complete the RDU in order to transfer out. [Doc. 83-4: Swink Decl. at ¶ 32].

Gregory Swink was a Program Director at Marion CI during the relevant time. [Doc. 83-4: Swink Decl. at ¶ 2]. One of his roles was to screen offenders for placement in the RDU. [Doc. 83-4: Swink Decl. at ¶ 12; see Doc. 83-6: Bullis Decl. at ¶ 9; Doc. 83-4: MSJ Ex. at 92]. In late May or early June of 2020, Swink screened offenders who were on RHCP from Alexander Correctional Institution ("Alexander CI") for the RDU program, including the Plaintiff. [Id. at ¶ 16]. Swink determined that the Plaintiff met all the criteria for placement in the RDU, and the Plaintiff was transferred to Marion CI on June 4, 2020 pursuant to Swink's request. [Id. at ¶¶ 18-19; Doc. 95: MSJ Resp. at 2; Doc. 83-10: Carver Decl. at ¶ 8].

Offenders in RDU are only allowed to retain certain items of personal property. [Doc. 83-4: Swink Decl. at ¶ 13]. Surplus property must be mailed, donated, or destroyed. [Id.]. The Plaintiff arrived at the RDU with three bags of property; he was made to ship or throw away two and a half bags of

6

personal items, including some items for his Native American religion (including a prayer pipe, feathers and a medicine bag) and law books. [Doc. 95: MSJ Resp. at 2, 15]. Carver was not in inmate receiving on the day that the Plaintiff was transferred in, and he was not made aware of any issues with the Plaintiff's property. [Doc. 83-10: Carver Decl. at ¶ 11].

In the RDU, the windows are small, and inmates are confined in their cells for 23 hours per day. Whenever inmates are out of their cells, they are fully restrained. Clothing and popcorn are used as rewards. Phone calls are restricted; the Plaintiff was allowed two phone calls per month only after he had spent 60 days in RDU. [Doc. 95: MSJ Resp. at 13-14].

The showers at Marion CI were designed with one drain before the RDU program was initiated. [Doc. 83-10: Carver Decl. at ¶ 13; Doc. 83-6: Bullis Decl. at ¶ 15]. Any complaints related to showers not draining are addressed by maintenance in a timely manner. [Doc. 83-10: Carver Decl. at ¶ 13]. The facility is inspected for safety and sanitation at least annually. [Doc. 83-6: Bullis Decl. at ¶ 15]. The showers and plumbing at Marion CI have never been noted as a demerit in any inspection during Bullis's employment there. [Id.].

Offenders in RDU have access to chaplaincy services, and they have access to religious services in Phase 3. [Doc. 83-4: Swink Decl. at ¶ 14; See

7

Doc. 83-4: MSJ Ex. at 82 (NCDPS Religious Services Policy & Procedures)]. Offenders assigned to RDU were not allowed to worship corporately but they were allowed to worship in their cells and speak to the chaplain upon request. [Doc. 83-5: Brendle Decl. at ¶ 7]. The Plaintiff has been practicing a Native American religion since 2008. [Doc. 95: MSJ Resp. at 15]. Marion CI has a Native American circle that is used to burn sage "to cleanse yourself" in the middle of the recreation yard that is also used for sports; there are no designated "sacred grounds." [Doc. 95: MSJ Resp. at 5]. The Plaintiff's request for a lighter to conduct a smoke ceremony in the circle was granted once he began RDU Phase 3 in November 2021. [Doc. 95: MSJ Resp. at 17].

RDU runs on a satellite feeding menu, which means that most meals are served in the units through food slots and are comprised primarily of processed foods. The Plaintiff was not allowed the same religious meal as was provided to inmates in the general population who practice the Native American religion. [Doc. 95: MSJ Resp. at 17].

During COVID-19, Marion CI followed directives from NCDPS in an effort to limit its spread. [Doc. 83-4: Swink Decl. at ¶ 27]. COVID directives included screenings; isolating and quarantining offenders exposed to the virus; extensive cleaning efforts; and face coverings. [Doc. 83-10: Carver

Decl. at ¶ 16].  During COVID, classes were no longer taught in person, and offenders who graduated from RDU were not allowed to transfer out of Marion CI. [Doc. 83-4: Swink Decl. at ¶ 28].  Marion CI was placed on code orange and red repeatedly beginning in mid-2020. During those times, no chapel materials or library books were passed out; there were no haircuts or visitation; recreation was cancelled when the staff was short-handed; there were limited cleaning and personal hygiene supplies; and there was no movement in the program, "which extended time in solitary confinement conditions." [Doc. 95: MSJ Resp. at 5-6; Doc. 24-2: Memo. Ex. at 1].

### B.   Mail Procedure

All staff assigned to the mailroom at Marion CI have to complete training before working in that area. [Doc. 83-10: Carver Decl. at ¶ 14]. Mailroom staff at Marion CI were properly trained at all times, including on the handling of legal mail.  [Doc. 83-10: Carver Decl. at ¶¶ 14, 21].  Two longtime employees left around the relevant time, but competent staff were temporarily assigned until new staff was hired.  [Doc. 83-10: Carver Decl. at ¶ 14].  While the Plaintiff was at Marion CI, he had several pieces of mail rejected. [Doc. 95: MSJ Resp. at 6, 18].  Numerous letters were rejected for "unknown substance on paper, or unknown smell" and four or five legal news subscriptions—including Prison Legal News—were rejected without

explanation, despite complying with NCDPS's publication rules.  [Id. at 6, 18-19].  Letters from "a few attorneys" to the Plaintiff were opened, and legal mail from a solitary confinement attorney was rejected without notice. [Id. at 20].  When mail was rejected, the Plaintiff would have it sent to his mother, who would send it back to him and he would usually receive it.  [Id. at 19].

## C.    Retaliation

The Plaintiff filed the instant lawsuit in March 2021. [Id. at 4].  He told RDU teacher Ms. Thomas about the lawsuit on March 23, 2021, and he voiced safety concerns about being housed at Marion.  [Doc. 10: TRO at 2; Doc. 95: MSJ Resp. at 4].  Thomas said that she would speak to Swink about having the Plaintiff shipped out. [Doc. 95: MSJ Resp. at 4].  A few days later, Thomas told Plaintiff that Swink said he was not going anywhere and to "deal with it." [Doc. 10: TRO at 2; Doc. 95: MSJ Resp. at 4].

On the evening of April 11, 2021 Sergeant Ingram was assisting night shift staff in conducting a facility unit search. [Doc. 83-11: Ingram Decl. at ¶ 7].  Sergeant Thomas conducted the search of the Plaintiff's cell. Ingram and Coffey were not involved in the search.[6]  [Id. at ¶ 15; Doc. 83-12: Coffey Decl. at ¶ 10].  Ingram overheard the Plaintiff become argumentative and curse at

---

[6] The Plaintiff's contention that Coffey ripped open the pillowcase of legal materials is conclusively refuted by the video footage.  [Doc. 95: MSJ Resp. at 4].

Sergeant Taylor, then observed the Plaintiff "square his body up, facing Sgt. Taylor," who immediately used hands-on force to "secure Plaintiff to the wall." [Doc. 83-11: Ingram Decl. at ¶ 7; Doc. 95: MSJ Resp. at 3; Doc. 95: MSJ at 3-4].

Ingram and Coffey began escorting the Plaintiff to restrictive housing for having cursed at Sergeant Taylor. [Doc. 83-11: Ingram Decl. at ¶ 8; Doc. 95: MSJ at 3-4]. Coffey commented that the Plaintiff is "fixin to see what happens to wanna be lawyers" as the Plaintiff was escorted out of the cell block. [Doc. 95: MSJ Resp. at 9]. The Plaintiff "never stopped walking, or resisted…" being taken to segregation.[7] [Doc. 95: MSJ Resp. at 10]. During the escort, Coffey placed the Plaintiff in a headlock and took the Plaintiff to the floor; the Plaintiff fell on Coffey, injuring him. [Id.]. Coffey punched the Plaintiff's face and Ingram applied two taser stuns to the Plaintiff's back while the Plaintiff was on the ground, in a headlock.[8] [Id. at 4, 10; Doc. 83-11: MSJ Ex. at 39 (Incident Report); id. at 70 (TASER report)]. The Plaintiff then rolled off of Coffey, staff removed him, and the escort continued without further

---

[7] The Defendants deny this and dispute the events that followed. [See Doc. 84-11: Ingram Decl. at ¶¶ 9-11; Doc. 83-12: Coffey Decl. at ¶¶ 11-14]. At this stage, however, the Court must view the forecast of evidence in the light most favorable to the Plaintiff.

[8] Coffey and Ingram state that they struck and tased the Plaintiff only after he refused to get off of Coffey. [Doc. 83-11: Ingram Decl. at ¶ 10-12].

incident. [Doc. 83-11: Ingram Decl. at ¶¶ 12-13; Doc. 83-12: Coffey Decl. at ¶ 15].

Coffey subsequently was taken to the emergency room where he was treated for a dislocated ankle and a broken fibula. [Doc. 83-12: Coffey Decl. at ¶ 16]. The Plaintiff sustained two red marks on his back from the taser, a small abrasion to the right side of his temple, and red cuts on his wrists from the handcuffs that tightened during the incident. [Doc. 95: MSJ Resp. at 11; Doc. 96: Resp. Ex at 23 (April 11, 2021 medical exam); Doc. 116-2: MSJ Ex. at 1-5 (color photos)]. The Plaintiff's shoulders and wrist x-rays were normal after the incident. [Doc. 96: MSJ Ex. at 37]. Over a year later, an x-ray report found "tiny benign cysts are present of several bones of the carpus." [Id. at 51].

The Plaintiff had to "deal with" Defendant Coffey between November 2021 and January 2022, which was "very stressful" because Coffey had punched him on April 11. [Doc. 95: MSJ Resp. at 5]. The Plaintiff was searched numerous times by Coffey and other staff during that time. [Id.]. The Plaintiff also had to "deal with" Defendant Ingram, who is in charge of the Phase 2 unit, from May 1, 2021 to mid-November 2021, which was stressful. [Id. at 4]

Tapp, who oversaw the grievance procedure, found out about the Plaintiff's Amended Complaint in the instant case around December 1, 2021. [See id. at 5; Doc. 10: Memo. at 2]. On January 12, 2022, it was discovered that the Plaintiff had made a pillowcase into a makeshift bag with handles; it was weighed down with multiple books and other property. [Doc. 83-14: Tapp Decl. at ¶ 7]. The bag was considered to be contraband because of its potential to be used as a weapon, so Tapp had the bag and its contents confiscated. [Id.; Doc. 95: MSJ Resp. at 14; Doc. 24: Memo. at 1-2]. The bag was taken apart and the property inside was inventoried. [Doc. 83-14: Tapp Decl. at ¶ 7]. The property that was not considered to be contraband was returned to the Plaintiff. [Id. at ¶¶ 7-10]. The Plaintiff was charged for no-threat contraband and was placed in restrictive housing for administrative purposes pending a disciplinary investigation. [Id.].

The Plaintiff was in RDU for a total of 31 months, during which time he incurred 28 infractions. [Doc. 95: MSJ Resp. at 14]. They included:

April 11, 2021: profane language, disobey order;

April 12, 2021: threaten to harm/injure staff, profane language;

April 13, 2021: threaten to harm/injure staff, profane language;

July 15, 2021: attempt Class A offense, substance possession; and

Jan. 12, 2022: threaten to harm/injure staff, assault staff w/unlikely injury.

13

[Doc. 83-3: MSJ Ex at 1].  These infractions resulted in the Plaintiff's placement on RDU non-participating status from April 11 to May 1, 2021; from July 16 to August 13, 2021; and from January 12 to February 22, 2022. [Id.; Doc. 83-16: Cothron Decl. at ¶ 16; Doc. 95: MSJ Resp. at 14].  After completing the last sanction, the Plaintiff refused to return to RDU, so the Plaintiff remained in non-participating status until he was transferred out of Marion CI on December 2, 2022.[9]  [Doc. 83-9: Haynes Decl. at ¶ 11].

The implementation of policy on RDU units is done through unit management who answer directly to the associate warden of custody.[10] [Doc. 83-5: Brendle Decl. at ¶ 3].  Todd Ishee, the Secretary of NCDPS, had no personal involvement in the Plaintiff's allegations; he does not know the Plaintiff and his duties did not require or allow for direct involvement or oversight in facilities' day-to-day operations or the promulgation or implementation of policies at the facility level.  [Doc. 83-17: Ishee Decl. at ¶¶

---

[9] The Plaintiff admits that he refused to return to the H-Unit on February 22, 2022.  [Doc. 95: MSJ Resp. at 14].  Accordingly, the Court need not accept his contentions that he was "done" with the RDU and that he was kept in segregation for "no reason."  [Id.]. The Court also need not accept the Plaintiff's contention that Defendant Tapp had Plaintiff's legal materials confiscated when he refused to return to Campbell's unit because such contradicts the allegations in the Second Amended Complaint.  [Doc. 95: MSJ Resp. at 14; see Doc. 25: Second Am. Compl. at 68-69].

[10] The Court need not accept the Plaintiff's contention that Carver, Cothron, Swink, and Ervin were directly responsible for RDU's operations and policy enforcement, as this is not based on the Plaintiff's personal knowledge.  [Doc. 95: MSJ Resp. at 21].

6-8].  Bumgarner had no personal involvement in any of the underlying allegations of the action.  [Doc. 83-7: Bumgarner Decl. at ¶ 10].  Brendle does not recall any specific interaction with the Plaintiff.  [Doc. 83-5: Brendle Decl. at ¶ 8].  The Defendants strive to behave professionally and according to NCDPS and Marion CI policies and procedures.  [Doc. 83-4: Swink Decl. at ¶ 33; Doc. 83-5: Brendle Decl. at ¶ 9; Doc. 83-6: Bullis Decl. at ¶ 21; Doc. 83-7: Bumgarner Decl. at ¶ 11; Doc. 83-8: Suttles Decl. at ¶ 19; Doc. 83-10: Carver Decl. at ¶ 22; Doc. 83-11: Ingram Decl. at ¶ 16; Doc. 83-12: Coffey Decl. at ¶ 20; Doc. 83-14: Tapp Decl. at ¶ 12; Doc. 83-16: Cothron Decl. at ¶ 24].

The parties have filed video footage with the Court that shows that the following events occurred on April 11, 2021 in a Marion CI dayroom:[11]

| | |
|---|---|
| 7:00:16 | Plaintiff stands outside his cell near a large pile of items on the floor, with several officers present. |
| 7:03:35 | A large white bag is placed on the floor outside Plaintiff's cell and an officer handles its top. |
| 7:03:54 | Two officers pick up the white bag and pull until it opens. |
| 7:04:31 | Officers who did not handle the bag approach Plaintiff. |
| 7:04:34 | The new officers place the Plaintiff against the wall, then turn him around and escort him away. |

---

[11] The other submitted video files do not aid in the summary judgment analysis.  [See Doc. 131].

7:04:54    An officer opens a white bag, removes books, flips through
           them, and removes papers that are folded inside.

[CD #1: C112 FIN17].

The events after Plaintiff was led away are not shown on any video that
has been submitted to the Court.

## IV.    DISCUSSION

### A.    Conditions of Confinement

The Eighth Amendment protects prisoners from inhumane methods of
punishment and from inhumane conditions of confinement. Williams v.
Benjamin, 77 F.3d 756, 761 (4th Cir. 1996). "The Eighth Amendment 'does
not prohibit cruel and unusual prison conditions.'" Thorpe v. Clarke, 37 F.4th
926, 940 (4th Cir. 2022) (quoting Strickler v. Waters, 989 F.2d 1375, 1381
(4th Cir. 1993)). "It asks instead whether the conditions of confinement inflict
harm that is, objectively, sufficiently serious to deprive of minimal civilized
necessities." Id. (citation omitted). "Prison conditions may be harsh and
uncomfortable without violating the Eighth Amendment prohibition against
cruel and unusual punishment." Dixon v. Godinez, 114 F.3d 640, 642 (7th
Cir. 1997).   Extreme deprivations are required. Hudson v. McMillian, 503
U.S. 1, 9 (1992).

To prevail on an Eighth Amendment claim, an inmate must satisfy both
an objective component—that the harm inflicted was sufficiently serious—

and subjective component—that the prison official acted with a sufficiently culpable state of mind.  Williams, 77 F.3d at 761. The Supreme Court has stated that "a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety."  Farmer v. Brennan, 511 U.S. 825, 837 (1994).  "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Id.  A plaintiff must also prove "a serious or significant physical or emotional injury resulting from the challenged conditions."  Strickler v. Waters, 989 F.2d 1375, 1381 (4th Cir. 1993).

The forecast of evidence demonstrates that Defendant Swink placed the Plaintiff in RDU because the Plaintiff qualified for the program.  The RDU imposes numerous restrictions that are gradually lifted through a system of increasing rewards for the purpose of encouraging positive behavior and decreasing unwanted behavior.  Such restrictions are not the type of extreme deprivations that rise to the Eighth Amendment level, even if the Plaintiff found them to be unpleasant.

The Plaintiff's speculation that the one-drain showers "exposed [him] to human waste from others 'urine' and who knows what else," [Doc. 95: MSJ

Resp. at 12-13], is insufficient to show that the Defendants exposed him to an excessive risk to his health or safety, much less that they did so knowingly. As to the extended periods of segregation that the Plaintiff experienced, the forecast of evidence shows that these were attributable to NCDPS's response to COVID-19, the Plaintiff's disciplinary infractions, and the Plaintiff's failure to participate in the RDU. There is no forecast of evidence that the RDU conditions and periods of segregation were imposed specifically to punish him, or that such was attributable to the deliberate indifference of any Defendant. The Plaintiff has failed to demonstrate the existence of a genuine dispute of material fact as to any Defendant's deliberate indifference regarding his conditions of confinement. Accordingly, the Defendants will be granted summary judgment on this claim.

## B. Mail Interference

As a general matter, prisoners have the right to both send and receive mail. See Thornburgh v. Abbott, 490 U.S. 401, 408 (1989); Pell v. Procunier, 417 U.S. 817 (1974). Restrictions on this right are valid if they are reasonably related to legitimate penological interests. Turner v. Safley, 482 U.S. 78, 89 (1987); see Haze v. Harrison, 961 F.3d 654, 658 (4th Cir. 2020) (noting that Turner applies to both convicted prisoners and pretrial detainees). For instance, the inspection of an inmate's outgoing and

incoming mail is reasonably related to legitimate penological interests. <u>See</u> <u>generally</u> <u>Wolff v. McDonnell</u>, 418 U.S. 539, 575 (1974); <u>Turner</u>, 482 U.S. at 89; <u>see</u> <u>also</u> <u>Altizer v. Deeds</u>, 191 F.3d 540, 547-48 (4th Cir. 1999) (opening and inspecting a prisoner's outgoing mail is, "[w]ithout question," reasonably related to legitimate penological interests); <u>Matherly v. Andrews</u>, 859 F.3d 264, 281 (4th Cir. 2017) (a "necessary implication" of <u>Altizer</u> is that prison officials may open and inspect a prisoner's incoming mail).

Isolated incidents of mail mishandling do not rise to the level of a constitutional violation. <u>See</u> <u>Buie v. Jones</u>, 717 F.2d 925, 926 (4th Cir. 1983) (stating that "a few isolated instances of plaintiff's mail being opened out of his presence" that were "either accidental or the result of unauthorized subordinate conduct ... were not of constitutional magnitude"); <u>Davis v. Goord</u>, 320 F.3d 346, 351 (2d Cir. 2003) ("[A]n isolated incident of mail tampering is usually insufficient to establish a constitutional violation.")

The forecast of evidence demonstrates that mailroom staff was properly trained at all times, that various pieces of Plaintiff's mail were rejected, and that several pieces of mail from lawyers were opened. The Plaintiff's dissatisfaction with mail processing, his disagreement with trained staff's determinations that certain pieces of mail violated prison rules, and isolated instances of mishandling, fail to demonstrate the existence of a

19

genuine dispute of material fact that his constitutional rights were violated. Accordingly, the Defendants' Motion for Summary Judgment is granted on this claim.

### C. Religion

To prove a free exercise claim under the First Amendment, a plaintiff must demonstrate that: (1) he held a sincere religious belief and (2) that his religious practice has been substantially burdened by a prison policy or practice. See generally Hernandez v. C.I.R., 490 U.S. 680, 699 (1989); Greenhill v. Clarke, 944 F.3d 243, 253 (4th Cir. 2019). A prison policy that substantially burdens an inmate's ability to practice his religion withstands a First Amendment challenge when it is "reasonably related to legitimate penological interests." O'Lone v. Estate of Shabazz, 482 U.S. 342, 349 (1987) (quoting Turner, 482 U.S. at 89). "A substantial burden either puts pressure on a person to change his religious beliefs or puts that person to a choice between abandoning his religion or following his beliefs and losing some government benefit." Firewalker-Fields v. Lee, 58 F.4th 104, 114 (4th Cir. 2023) (citing Lovelace v. Lee, 472 F.3d 174, 187 (4th Cir. 2006)). If that threshold showing is made, the prisoner must then show that the practice or regulation is not "reasonably related to legitimate penological interests." Id. (quoting Turner, 482 U.S. at 89).

The RLUIPA provides "greater protection for religious exercise than is available under the First Amendment." Ramirez v. Collier, 595 U.S. 411, 424 (2022) (quoting Holt v. Hobbs, 574 U.S. 352, 357 (2015)). A substantial burden on a prisoner's religious exercise under RLUIPA must satisfy strict scrutiny rather than reasonableness. See Faver v. Clarke, 24 F.4th 954, 959-60 (4th Cir. 2022); see 42 U.S.C. § 2000cc-1(a).

As a preliminary matter, summary judgment will be granted on the Plaintiff's RLUIPA claims because claims for damages under RLUIPA are barred by the state's Eleventh Amendment immunity. See Sossamon v. Texas, 563 U.S. 277, 285-86 (2011) ("[RLUIPA] does not includes suits for damages against a State"); Rendelman v. Rouse, 569 F.3d 182, 184 (4th Cir. 2009) ("RLUIPA does not authorize a claim for money damages against an official sued in her individual capacity"). Although non-monetary relief is available under RLUIPA, such a claim is moot here because the Plaintiff is no longer incarcerated in NCDPS. See Rendelman, 569 F.3d at 184 (holding that an inmate's transfer to federal custody rendered moot his claim for injunctive relief under RLUIPA). Accordingly, the Plaintiff's RLUIPA claims cannot proceed.

The Defendants do not dispute that the Plaintiff's religious belief in the Native American religion is sincerely held. Beyond that, however, there is

no forecast of evidence that the Plaintiff's exercise of his belief was substantially burdened by the Defendants' alleged conduct. The forecast of evidence shows that the Plaintiff could worship in his cell, could request to speak with a chaplain, and had access to religious services, including a Native American Circle in the in the recreation field when he was moved to RDU's Phase 3. That the Plaintiff would have preferred to have his religious items in his cell with him, access to a dedicated prayer circle made of river rocks, less processed food, and the ability to eat outside of his cell, this is insufficient to show a substantial burden. The Plaintiff has failed to forecast evidence that any of the foregoing was required by, or prohibited by, the precepts of his religion. See Kelley v. Newton, 7:21-cv-499, 2023 WL 4687932 (W.D.Va. July 21, 2023) (noting that "courts have consistently held that complaints which fail to explain how or why restriction is burdensome do not state a plausible Free Exercise claim"). Nor has the Plaintiff forecast evidence that he was forced to change his religious beliefs, or that he was required to choose between abandoning his religion or following his beliefs and losing some government benefit. See Lovelace, 472 F.3d at 187. The *de minimis* inconveniences that the Plaintiff experienced in the RDU do not rise to the constitutional level. See Carawan v. Mitchell, 400 F.Supp.3d 371 (W.D.N.C. Aug. 14, 2019) (citing McEachin v. McGuinnis, 357 F.3d 197, 203

n.6 (2d Cir. 2004) (a mere inconvenience to the exercise of religion fails to give rise to a First Amendment violation); Rapier v. Harris, 172 F.3d 999, 1006 n.6 (7th Cir. 1999) ("de minimis burdens on the free exercise of religion are not of constitutional dimension")).

Moreover, even if the Plaintiff's religious exercise were substantially burdened, such restrictions were reasonably related to legitimate penological interests. The forecast of evidence demonstrates that the RDU housed dangerous inmates like Plaintiff with extensive disciplinary histories as an alternative to RHCP, and that the property limits and movement restrictions helped to ensure the program's security and effectiveness. These goals are rationally related to legitimate penological interests. See Turner, 482 U.S. at 84-85 (emphasizing the strong deference granted to prison administrators in matters of institutional security and administration). Accordingly, no First Amendment violation occurred even if a substantial burden on his religious exercise existed.

The Plaintiff has failed to demonstrate the existence of a genuine dispute of material fact as to his religious freedom claims and, therefore, the Defendants' Motion for Summary Judgment is granted on these grounds.

## D.    Excessive Force, Assault, and Battery

The Eighth Amendment prohibits the infliction of "cruel and unusual punishments," U.S. CONST. amend. VIII, and protects prisoners from the "unnecessary and wanton infliction of pain." Whitley v. Albers, 475 U.S. 312, 319 (1986).  To establish an Eighth Amendment claim, an inmate must satisfy both an objective component–that the harm inflicted was sufficiently serious–and a subjective component–that the prison official acted with a sufficiently culpable state of mind.  Williams v. Benjamin, 77 F.3d 756, 761 (4th Cir. 1996).  In adjudicating an excessive force claim, the Court must consider such factors as the need for the use of force, the relationship between that need and the amount of force used, the extent of the injury inflicted, and, ultimately, whether the force was "applied in a good faith effort to maintain or restore discipline, or maliciously and sadistically for the very purpose of causing harm." Whitley, 475 U.S. at 320-21.  Furthermore, the Supreme Court has made clear that "[a]n inmate who is gratuitously beaten by guards does not lose his ability to pursue an excessive force claim merely because he has the good fortune to escape without serious injury." Wilkins v. Gaddy, 559 U.S. 34, 38 (2010).

The forecast of evidence demonstrates that a genuine dispute of material fact exists as to whether Defendants Ingram and Coffey used

excessive force. The forecasts of evidence are in sharp contrast as to what occurred after Plaintiff was escorted away from his cell. While there is video footage of the events at the entrance to Plaintiff's cell, there is none showing the disputed altercation. The Defendants' Motion for Summary Judgment is, therefore, denied on the Plaintiff's claims against Defendants Ingram and Coffey for the use of excessive force under § 1983. Because the Plaintiff's § 1983 excessive force claims have survived summary judgment, the Plaintiff's North Carolina assault and battery claims based on the same incidents will likewise proceed. See Rowland v. Perry, 41 F.3d 167, 174 (4th Cir. 1994).

### E.    Retaliation

An inmate has a clearly established First Amendment right to be free from retaliation for filing lawsuits. See Booker v. S.C. Dep't of Corrs., 855 F.3d 533, 540 (4th Cir. 2017); Thompson v. Commonwealth of Va., 878 F.3d 89, 110 (4th Cir. 2017). Inmates also have a protected First Amendment right to complain to prison officials about prison conditions and improper treatment by prison employees that affect them. See Patton v. Kimble, 717 Fed. App'x 271, 272 (4th Cir. 2018).

To prevail on a colorable First Amendment retaliation claim, a plaintiff must show that (1) he engaged in protected First Amendment activity, (2) the

defendant took some action that adversely affected his First Amendment rights, and (3) there was a causal relationship between his protected activity and the defendant's conduct.  Martin v. Duffy, 977 F.3d 294, 299 (4th Cir. 2020) (quotation marks and citation omitted).  Retaliation claims brought by prisoners, however, are treated with skepticism because every act of discipline by a prison official is retaliatory in that it responds directly to prisoner misconduct.  See Adams v. Rice, 40 F.3d 72, 74 (4th Cir. 1994).

The Plaintiff's retaliation claim against Defendant Swink is based on the allegation that Defendant Swink refused to transfer him out of the RDU after the Plaintiff complained about staff.  [Doc. 25: Am. Compl. at 61].  The forecast of evidence, however, demonstrates that  the RDU is not voluntary, and that offenders have to complete the RDU in order to transfer out.  [Doc. 83-4: Swink Decl. at ¶ 32].  The Plaintiff has not forecast any evidence of a causal relationship between a protected activity and Defendant Swink's alleged failure to grant a transfer; in fact, the forecast of evidence shows that Swink had no ability to grant or deny a transfer in the first place.  Accordingly, there is no genuine dispute as to Swink's alleged retaliation.

As to the Plaintiff's claims of retaliation against Defendants Coffey and Ingram, the undisputed forecast of evidence demonstrates that Defendants Coffey and Ingram took the Plaintiff to segregation for cursing at Sergeant

Taylor. However, there is a genuine dispute as to whether Defendants Coffey and Ingram used excessive force during that escort and, if so, whether such force was retaliatory for the Plaintiff's conduct toward Sergeant Taylor. Accordingly, the Defendants' Motion for Summary Judgment is denied as to the Plaintiff's retaliation claims against Defendants Ingram and Coffey with respect to the incidents of April 11th.

The Plaintiff also claims that he was "stressed" when he had to "deal with" Coffey and Ingram after April 11, and that he was subjected to searches by Coffey and others. Plaintiff's forecast of evidence regarding this claim is vague and conclusory, particularly considering that it is undisputed that Coffey was out of work with a broken leg for some time thereafter. Moreover, there is no forecast of evidence of a causal connection between any protected activity by the Plaintiff and any adverse actions by Ingram or Coffey after the incidents of April 11th. Therefore, summary judgment is granted with respect to their other alleged acts of retaliation.

As to the Plaintiff's claims of retaliation against Defendant Tapp, the forecast of evidence demonstrates that Defendant Tapp oversaw the grievance procedure; that Tapp learned of the instant lawsuit around December 1, 2021; that Tapp confiscated Plaintiff's legal materials; and that he took disciplinary action against him including placing him in segregation.

However, the Plaintiff has failed to forecast evidence that any of these actions were taken in retaliation for the Plaintiff's exercise of his rights. The mere temporal proximity between some of Tapp's actions and the Plaintiff's disciplinary actions are insufficient to demonstrate the existence of a genuine dispute of material fact, especially in light of the Plaintiff's extensive history of disciplinary infractions.

Accordingly, the Defendants' Motion for Summary Judgment is denied as to the Plaintiff's claims that Defendants Coffey and Ingram retaliated against him by using excessive force on April 11th, but it is granted as to all of the Plaintiff's other retaliation claims.

## F. Qualified Immunity

"Qualified immunity protects officers who commit constitutional violations but who, in light of clearly established law, could reasonably believe that their actions were lawful." Henry v. Purnell, 652 F.3d 524, 531 (4th Cir. 2011) (en banc). "To determine whether an officer is entitled to qualified immunity, the court must examine (1) whether the plaintiff has demonstrated that the officer violated a constitutional right and (2) whether that right was clearly established at the time of the alleged violation." E.W. ex rel. T.W. v. Dolgos, 884 F.3d 172, 178 (4th Cir. 2018) (internal quotation marks omitted). The doctrine of qualified immunity "gives government

28

officials breathing room to make reasonable but mistaken judgments and protects all but the plainly incompetent or those who knowingly violate the law." Smith v. Ray, 781 F.3d 95, 100 (4th Cir. 2015) (internal quotation marks omitted).

The Plaintiff has not forecast evidence that any Defendant violated a clearly established constitutional right, save for the claims of excessive force and retaliation against Defendants Ingram and Coffey that allegedly occurred on April 11, 2021. See Mitchell, 954 F.2d 191 (noting that there "can be exceptional circumstances where the general rule [regarding the complete deprivation of exercise for an extended period of time] does not apply"). The Defendants are, therefore, entitled to qualified immunity as to all of the Plaintiff's claims, with the exception of the Plaintiff's April 11 claims of excessive force and retaliation against Defendants Ingram and Coffey, and summary judgment is granted with respect to such claims on this ground as well.

## V.    CONCLUSION

For the reasons stated herein, the Court grants Defendants' Motion for Summary Judgment is granted in part and denied in part.

## <u>ORDER</u>

**IT IS, THEREFORE, ORDERED** that:

1. The Defendants' Motion for Summary Judgment [Doc. 81] is **GRANTED IN PART AND DENIED IN PART**. Specifically, the Defendants' Motion is **DENIED** with respect to the Plaintiff's claims of excessive force and retaliation against Defendants Ingram and Coffey stemming from the events of April 11, 2021. In all other respects, the Defendants' Motion is **GRANTED**, and the Plaintiff's claims under 42 U.S.C. § 1983 and the Religious Land Use and Institutionalized Persons Act ("RLUIPA") for imposing unconstitutional conditions of his confinement, for violating his right to freely exercise his religion, for retaliation and for interfering with the mail are **DISMISSED WITH PREJUDICE**.

2. The parties shall notify the Court within **fourteen (14) days** of this Order whether they object to a judicial settlement conference in this matter.

3. The Clerk is respectfully instructed to update the Court's record to reflect the correct spelling of Defendant Coffey's last name.

**IT IS SO ORDERED.**

Signed: October 7, 2024

Martin Reidinger
Chief United States District Judge